We're ready to move on then to the next oral argument on our calendar. I'm sorry, the case of United States of America v. Donald Stanley has been submitted on the briefs. And so that does bring us to the Geo Group, Inc. and United States of America v. Gavin Newsom and State of California. And I know that the American Civil Liberties Union is also participating in this oral argument. So if counsel are ready to proceed, you may begin. Thank you, Your Honor. This is Mark Stern for the United States, sharing time with Michael Kirk representing the Geo Group. And with court permission, I'll try to reserve three minutes for rebuttal. This is not a case that is about a question of policy. The question, and this is the crucial point, is whether the federal government gets to make the policy choices for the federal government. As the court knows, California has barred contractors from doing work with the federal government to operate private detention facilities for ICE. Mr. Stern, because our time is a little limited here, even though you have 20 minutes per side here. I wanted to ask you, why doesn't the presumption against preemption apply here? It seems to me that there's certainly arguments here that AB 32 is regulating the public health and safety, which are traditionally matters of state concern. Can you respond to that, please? Certainly, Your Honor. There's no presumption against preemption when a state purports to regulate the United States or its contractors, which is going back to cases such as Leslie Miller or Boeing. Courts made clear that regulating contractors working for the United States is going to be pretty much the same as regulating the United States itself. There's a presumption against preemption when both the federal government and the state government regulate private conduct. In those cases, when you have a federal scheme and a state scheme and you're looking to see how they operate on private people, there is indeed a presumption against preemption. But that has no applicability when a state purports to interfere with the operations of the federal government. And notably, there is not a case, as far as certainly none that's cited and none of which we're aware of, which has ever upheld a restriction that's remotely like this one. On the contrary, what we have going back for decades and decades and decades are cases in which the Supreme Court, this court, and other courts have all held that restrictions on the government's ability to carry out its operations using contractors are impermissible when they are far less intrusive than this case. I mean, Leslie Miller was a case about a generally applicable Arkansas statute imposing qualifications on contractors. This court's decision in Gartrell Construction, likewise, a generally applicable licensing requirement. The Fourth Circuit's decision in the United States versus Virginia, again, a generally applicable licensing requirement. So these are the cases that are so much less intrusive, they are generally applicable restrictions, all of which are in the core of the public health and safety. Nobody doubted that the licensing requirements as generally applied in any of those cases were invalid. But if you try to impair the United States' ability to contract with persons whom it believed were most appropriate for carrying out its functions, that was impermissible. And here, far from just limiting the group of people, the United States has been told, no, here's what, the group is now a null set. There are no people whom you can contract with to perform this function. And again, there is no case that sort of even comes close to being like this one. There's nothing sort of unique about this particular type of facility or anything else that distinguishes it from the ability of California or any other state to decide for what it deems to be. And no one questions here like California's sort of good faith in its policy judgment. Again, it's not a question of policy, but you could have the same kind of restriction on any sort of research facility that the federal government might fund, that a state might think this is injurious, it is immoral, it is in some way contrary to a state's interest, and we're going to preclude people from contracting with the federal government. What about our decision in United States versus California? I naturally think that this court's analysis there is pretty helpful to understanding this case. I mean, there we had a sort of inspection statute that was upheld. But what the court said, and I just want to quote this because it's so directly on point here, what the court says, and this is at 921 F. 3rd 885, it contrasts the scheme there with cases such as Leslie Miller and Gartell Construction, which, quote, prevented the federal government from entering into agreements with its chosen contractors until the state's own licensing standards were satisfied. And the court then says, quote, these cases event states active frustration of the federal government's ability to discharge its operation. And since those concerns were not present there, this is exactly the case that the court was referring to, and it was careful to say that in that other case. And this is what the court was referring to. And let's just assume, because I know you're arguing that the presumption does not apply here, let's just assume that it does. What's your best argument then after that? Well, let's assume there's a presumption. I mean, first, the presumption wouldn't apply to principles of intergovernmental immunity. There's no presumption that if even on preemption, however, you would look at the principles of obstacle preemption and you go, does this statute constitutes like an obstacle in this case, a significant obstacle to the implementation of a federal scheme? And the answer is clear. Of course it does. Way more clearly than, say, in Crosby case involving the Burma sanctions. In that case, there was no law sort of at issue, except Congress had given the president certain authority to issue, to promulgate sanctions against Burma. Supreme Court said, look, that's enough for us to conclude that if Massachusetts tries to do something, it might like constitutes an obstacle to the full effectiveness of that scheme. Here, this scheme is like locked down in its tracks. I mean, this is as big an obstacle to a scheme as you get. Why don't the obvious differences between the state facilities and the federal facilities here, specifically the fact that the CDCR facilities are under a court order, allow California to treat these facilities differently? Well, I mean, it's even, even if we assume that, I mean, the question is not whether, I mean, there are two things, there are two lines of inquiry. And one is intergovernmental immunity. And there, even if there's like equal treatment, it doesn't have to be differential. Differential makes it as we think it is here. We can assume federal government is clearly singled out. But even if it weren't, if you pass a law that has the effect of stopping the federal government from engaging in its activities, that's enough. And remember, all those other cases we were talking about, those are all laws of general application. They like apply to every contractor in the state. So there's nothing special about singling this out, either for purposes of intergovernmental immunity or for preemption. So whether or not, I mean, I'm happy to talk about why, you know, the argument that the state is being treated the same as the federal government, we don't think holds up. But at bottom, it doesn't matter whether it does or not. Well, I did have a question, though, because you assert that AB 32 will require the United States to close all of its ICE facilities and California to close none of its facilities. Can you break that down for me a little bit? Why wouldn't California be required to close some of its facilities? If we said that it doesn't require it to close any of its facilities, I apologize, I'm not at all sure that that's true. But let's look at the way AB 32 actually works. I mean, the first section one of AB 32 tells you what California has decided to do. And because California doesn't need to preempt and doesn't need to bar contractors for anything it does, then it's the state and section one isn't even worded in terms of contractors. I mean, like a state like doesn't regulate itself. It's only regulating other entities. So when the state regulates the United States, well, that's a regulation. The state says I'm not doing something. Well, that's just the state saying it's not doing something. That's not a regulation, even if it's phrased in terms of contractors. And again, section one isn't even phrased in terms of contractors. But the bottom point is, again, if we picture and just as a matter of common sense, if we picture states throughout the country deciding for various public policy reasons that they're going to be maybe not even as extreme as this, but that they are going to make it difficult or in this case impossible for the federal government to contract to perform its operations. I mean, that would be the full extent of that would be extraordinary. And this is pretty extraordinary in and of itself. And again, California offers no instance, none, in which anything like this has ever been sustained. And it makes fun of us for quoting the Supreme Court. But I mean, I think for intergovernmental immunity, I think there has to be some showing that the federal government's being treated differently here than the state is. And again, I just wanted to know, why wouldn't California be required to close some of its facilities? I mean, again, California can choose to close whatever facilities it wants to. And again, I apologize if we said that California would not have to close any facilities. I'm not at all sure that that's true. If they do, then how are they, because they're not having to close all of them? I'm trying to figure out how the federal government is being treated differently. I mean, the fundamental difference is that California can decide to do whatever it wants to do for itself. And that's not even regulating what it can't do. And it doesn't need to be treating the federal government differently. Intergovernmental immunity does not depend on discrimination. It often involves discrimination. But what all of the cases make clear is, going back, Leslie Miller, Johnson, you pick the case. It doesn't matter whether you can, the way that you analyze it is, you go, if you have something that operates on the federal government or its contractors to stop the federal government from doing what it feels is necessary to execute its duties, that's the end of the story. And that's why all of those cases involve, or not all of them, but most of them, involve statutes of general applicability. So even if AB 32 encompassed lots of private entities and didn't single out the United States in any way, which is not the case, but even if that were true, it would not change the bottom line answer. Can you address the state's argument, I think, actually, the amicus' argument that the statutory framework for federal prisoners mentions that the attorney general can contract with private parties for prisons explicitly says that, that the analogous framework for immigration detention doesn't expressly mention the power to contract with private parties. Can you address that difference? Yeah, I mean, the ACLU goes further to say, like, pretty extraordinarily that there would, in fact, just be no authority to do this, which after 50 years or so is going to come as a surprise to a lot of people. But the, like, it is true that unlike the marshal service, I mean, because the district court, if your honor is referring to the preemption analysis in the district court opinion. It's that sort of language. Why does it, you know, for in the criminal context, I think it's 18 U.S.C. 4031, it mentions the attorney general can contract with private parties, but for the detention, immigration detention, doesn't mention explicitly the power to contract with private parties for detention. I'm just asking you, you know, why there's a difference in that sort of language? Well, I mean, we cite in our reply brief in response to this argument a number, I mean, both the organic statute, which gives broad authority to the attorney general and now DHS. But if there were any doubt on it, Congress, like in the fiscal year 2021, the previous year, many years before, has specifically, when it makes the appropriations, it specifically appropriates with respect to the operation of these private facilities. I mean, Congress is doing that. The appropriation itself is sufficient authorization, and it does it and it puts in conditions about how if you've been, if the contractor has twice been found to not be up to par, you can't make a contract with them. I mean, this is something like the Congress has been on top of for years. And the argument that the ACLU makes primarily says that when Congress in 1996 passed the sort of sweeping sort of reform of welfare and so forth, and included a specific grant of authority to contract the states, that implicitly it must have repealed the longstanding practice of contracting with private parties, which there's no evidence whatsoever that it did. And indeed, other parts of the same statute make clear that Congress understood that that was continuing to be the case. And at that point, for at least 10 years, Congress had been doing that. I mean, there's never been a question up until now about this. And again, as you know, while, you know, like, it's important that, you know, the federal government has got to keep reviewing its options, has to make decisions about to what extent to go forward on the same route that it's been. But as of now, all of the ICE facilities in California are operated in this fashion, as are facilities across the country. That's been the case for decades and decades. No one's ever questioned that or their crucial importance. And the district court fully understood the importance and recognized the burden that would be involved as a result of its order. It simply thought that that didn't matter because the statute was perfectly legal. But we think that that's where the district court went seriously astray. I think I might be on to the negative time. But I'll give you a couple minutes for your rebuttal. But let me move on, I guess, to Mr. Kirk. Mr. Chairman, would you like to state your appearance? Thank you, Judge McGeough. Michael Kirk on behalf of GEO and may it please the court. Judge Lee, I would direct your attention to 18 U.S.C. section 4013 to the note that appears after the body of the statute where in a 2000 appropriation statute, Congress said this, notwithstanding any other provision of law, the now Secretary, then Attorney General, hereafter may enter into contracts for detention or incarceration space or facilities, including related services on any reasonable basis. This court has held in a number of cases, most recently the tin cup decision, 904F3 at 1073, that when Congress uses hereafter in an appropriation statute, it intends the law to apply going forward as a substantive matter. So Congress has expressly authorized the use of these private detention facilities. As Mr. Stern pointed out and is incited in the government's reply brief, every appropriation bill since AB 32 was enacted, and I'm sure many before then, have contained the same language that appears in this note. Judge McGeough. Mr. Kirk, before you address my, isn't that statute part of the criminal code, not part of the immigration? It appears in the criminal code, but it's talking about spaces for immigration services. I'm not sure it's related to the immigration detention as far as I can tell, but I appreciate you highlighting that. Can you go ahead and proceed with what you were going to address to me? I was going to try to answer another of your questions, Judge McGeough. Both the Supreme Court and this court have held in case after case that it is settled that any state law that obstructs or burdens a federal function by regulating the performance of a government contract is unconstitutional under intergovernmental immunity principles. And that is true regardless of whether the statute discriminates against the federal government or not. In Leslie Miller and Gutrell, state laws imposing licensing requirements on government contractors were struck down. In Public Utilities Commission, the court invalidated a state attempt to regulate the rates that the federal government pays for trucking services. They were applying the same rate regulation that they applied to everybody else, yet the court struck it down as a direct regulation. It seems like those cases involve schemes of regulation. This is something rather different. The state is doing it under their inherent police power to control the health and safety in their state. I'm just trying to figure out which cases really guide us in this area. I see that you are proposing that we adopt a substantial interference test for determining whether the state law directly regulates the federal government. I'm just curious because I think I know the answer to this, but I want to see if I'm right or not. Is there any other circuit that has adopted this test? I believe this court did in the Boeing case, number one. Number two, the Supreme Court has adopted it in Hancock, in Mayo, in Public Utilities Commission. In case after case, if you look at the court's analysis, what it's done is it's looked to see is the federal function being obstructed or frustrated or substantially burdened. That's the legal, I mean that's the incidence test. No, your honor, I don't believe it is because in many of those cases, the quote incidence of the regulation fell not on the federal government but on the contract. In Public Utilities Commission, the incidence fell on the truckers who were required to comply with the truck regulations. In Boeing, the incidence fell, I guess, on both in Boeing. I would look to Boeing as your lodestar in this, Judge McGeer, because there, this court specifically held that when, as in that case and as here, the state purports to regulate not only the federal contractor but the effective terms of federal contract itself. It constitutes direct regulation of the federal government in violation of the intergovernmental immunity doctrine and must be struck down. It follows a fortiori that a state law that doesn't simply regulate the terms of the contract but actually prohibits the contract from coming into being is clearly unconstitutional. That's what AB 32 does here. I think it's important to note, your honor, that it is telling that California can cite no case where a court has ever permitted a state to prohibit persons within its boundaries from contracting with the federal government over any subject. There's no stopping point to the state's theory. If the states can impede the operations of the federal government by prohibiting persons within their boundaries from contracting for services that the federal government wants, there's no principle basis for limiting the state's regulatory power over government employees. After all, employment is just another form of contract. Under California's theory, a state could block immigration detention altogether by prohibiting persons within the state from working at an immigration detention facility. Any federal policy the state disagrees with can be effectively blocked under California's theory by prohibiting persons within the state from facilitating it. Just last week, your honor, the governor of Texas ordered state child care facilities to yank the licenses from facilities under contract to the federal government to house minors who come across the border without papers. He did that because he disagrees with the current administration's immigration policy. Under California's theory, Texas could go further and actually prohibit persons in Texas from housing undocumented minors under contract with the federal government and thereby completely obstructing the federal operations to care for these children. The Constitution does not permit this kind of obstruction of federal operations by the states. Perhaps the single biggest driver that led the framers to replace the Articles of Confederation was the felt need to preclude individual states from thwarting national policy in this way. Your honor, I'd go further and say even if the AB 32 had not directly regulated the federal government by obstructing its operations, it is, in fact, discriminatory. Judge Murguia, you asked my friend, Mr. Stern, how do we know that AB 32 allows the state exemptions across the board? The answer is, if you look at the text of the statute, it gives them an exemption for their prison system because of the court-imposed caps, it said. That was its justification, and that's invalid, your honor, under the Supreme Court's decision in Dawson that says the justification for why they want the exemption is completely irrelevant. The question is, are they treating the federal government differently than they're treating themselves? Beyond the prisons, if you look at section 9502, I think it is, there's a laundry list of six or seven different state facilities that are exempted from the law. The bottom line, and California has not disputed this, if you look at their brief, we said in our opening brief that taken together, these exemptions allow California to continue to operate private detention facilities in all of their facilities, whereas the federal government isn't allowed to operate private facilities in any of its institutions. And that's the question I had asked your friend, Mr. Stern, and so is there any evidence in the record that shows, you know, how California is required to close some of its facilities or it is actually closing all of its facilities? Well, Your Honor, I think the state has asserted that it is closing some or all of its facilities, but respectfully, that's irrelevant. The question in the Supreme Court has said this in Dawson. How is that irrelevant if we're looking on, if there's a discriminatory element to this, how is that irrelevant to discrimination? Because you measure discrimination based upon what the statute allows. And even if they've voluntarily chosen to close some or all of their institutions, that's not what matters. The statute allows them to keep them all open because they all fit within the exemption, whereas it doesn't allow the federal government, which faces overcrowding and other problems, just like California, it doesn't allow the federal government to keep any of its facilities open. And again, if you look at the Dawson case from the Supreme Court a couple of years ago, it instructs that you look at the face of the statute to see how it treats the states and how it treats the federal government. What the state chooses to do voluntarily just doesn't enter into it. After all, the state has always had the ability to, if it believes that private facilities are bad, it doesn't need to use them at all. That's completely within its sovereign power. And I see my time is up, so unless the court has any other questions, I will subside. Okay, thank you. So I think, is it Ms. Boutin, you're going first? Yes, Your Honor. Good morning, Deputy Attorney General Gabrielle Boutin, on behalf of Appellee's Governor Newsom, California Attorney General Bonta, and the state of California. In 2019, the California legislature recognized that there was a health and safety problem within its borders regarding how private companies operating detention facilities were treating their detainees. And as this court stated in U.S. v. California, California has the historic police power, quote, to ensure the health and welfare of inmates and detainees in facilities within its borders. Pursuant to that power, the state enacted AB 32, which generally prohibits private entities and individuals from detaining other persons within the state. The law is an exercise of the state's sovereign authority and does not violate the Supremacy Clause. And that conclusion follows from the proper legal analysis here. That is not just a generalized consideration of federal policies or burdens on the federal government for activity that it is undertaking right now, but by examining carefully each of the Supremacy Clause doctrine discussed, in particular in North Dakota and its Ninth Circuit progeny. I'd like to start with conflict preemption. And I think the important point, and I'd like to talk about all three of the prongs, actually. So I'm going to start with conflict preemption, and then I'd also like to discuss intergovernmental immunity in terms of both direct regulation and discrimination. But to start with preemption, I think what's important here is first, as was discussed earlier, there is a presumption against preemption. And as I said before, that was established in U.S. California. This is the exercise of a historic police power. I believe Council earlier referred to whether or not that applied when the federal government or its contractors were being burdened. I don't believe that proposition is supported by any case law, or at least I haven't seen it. Any kind of related statement, I believe, would actually go to intergovernmental immunity. Isn't United States versus California somewhat distinguishable here because the regulations the court were discussing there were more obviously related to health and the public health? I'm just trying to figure out if that really should guide us here when it's less of a connection to the health. I mean, that involved state health inspections of ICE facilities. Sure, Your Honor. I think there is a clear connection here as well. These facilities create threats to the health and welfare of the detainees. There is a well-documented record on that. And that was the purpose of this law. It's just essentially kind of going a step further than those investigations. But the police power is the same. It really is essentially historic police power of determining what private actor can detain another private actor. And that is essentially a police power here. Can I ask you a question, please? So how do we make that determination? Because it seems to me that the parties are characterizing what's occurring here in different ways. California characterizes the statute as regulating health and welfare of persons detained within its borders. And the government and the GEO group characterize this regulation as controlling immigration detention. I don't know that I think either of those is obviously right or obviously wrong. But you're both characterizing the regulation at issue in different ways. What guideposts are there for us to determine what it really is? Because if it is a regulation of health and safety within the state, then it is within the state's historic police powers. But if it's a regulation of the federal government's ability to control immigration detention, it is not. And I've just seen both parties argue about what it is, but I don't know that anybody's told us how we're supposed to decide what it is. Well, I think you have to look at what the law itself actually does. And the law itself, again, prohibits private actors from taking certain actions. And I suppose there is a relationship with the direct regulation prong in the sense that in this situation, it is an effect on the federal government that its ability to have private contractors operate these detention facilities is curtailed. That's obviously an effect. But when you look at what the statute actually does and what it's actually trying to control, that is private parties. And obviously, it's clear it's for the health and safety of those detainees, just as was the exercise of power in U.S.C. California. And I'm not sure doctrinally how these fit together, but that raises a question in my mind. If California is concerned about the safety and the welfare of persons detained within its borders, why did it essentially exempt all of its own private detention facilities? They have no concern for the people detained in private facilities when California has the contract to do that, but they do when the federal government has the contract? I don't think that's exactly what the law does. The law does prohibit persons from operating any detention facility, including criminal detention facilities such as state jails or prisons, in contract with California. So it does limit itself as well. And with respect to other exempted facilities, those are by their very nature not similarly situated to criminal and immigration detention facilities. They have to do with school detention, detaining a shoplifter in a grocery store, things that are clearly not the same in nature as the facilities at issue here. So while they're called exceptions, they also clearly don't fall into the category of detainees that need protection for their health and welfare here. So minors, people with mental health issues, people in rehabilitation centers, halfway houses, California is not concerned about their health and safety if a private contractor is running those facilities. They are if it's a Department of Corrections facility or an ICE facility. But the Department of Corrections is exempted because they're subject to a population cap. So the result is the only people that California is expressing any concern about are people in ICE facilities. Maybe I'm completely wrong. When I read this, I don't know how to get away from that conclusion. Sure, Your Honor. I would say California is absolutely concerned about the health and safety of people in the facilities that are listed as accepted in the law. But they are different types of facilities run in different ways. And there's not that record evidence of there being health and safety problems that exist in these other types of facilities. But those are the only exemptions. The Department of Corrections, their facilities, I think all of them are probably exempted, right? Are there any prison facilities in California that are not subject to a court order with respect to a population cap? Well, I think the facts as they are right now is that they have closed down all of those. They have closed down all of those private facilities, the state that were contracted with the CDCR. Those are all closed down. And the statute exception essentially made it so that it applied only if necessary in order to comply with the court order. Facts on the ground are that it wasn't necessary, and therefore they closed them down. And I would like to add, I think one important point, too, is we are talking about a preliminary injunction, and we are talking about preliminary relief. And as the Supreme Court has said, if there's one part of the law in the discrimination analysis that may be discriminatory, the proper remedy is not to strike down the whole law. So if the court were to find that one of these exceptions created discriminatory treatment, the proper remedy would either be to send that exception to the federal government or to take it away from the state. And I would say that making that choice would probably be something that maybe should be remanded to the district court if discrimination were to be found. But I suppose my point is if one of those provisions is found to be discriminatory, that would not constitute grounds to grant a full preliminary injunction as requested here. Can you clarify, in California today, are there private prisons housing people who normally would be housed by the Department of Corrections? No, there are none. So that's, I think, my question I had as well. So AB 32 requires California to close any of its private prisons, and it has closed its private prisons. That's right, Your Honor. How many does that involve? I do not know that answer off the top of my head. I apologize. And so on the status of the court-ordered population cap, you've been discussing that, but that applies to the CDCR facilities, is that correct? Oh, that's right. And so has it prevented California from closing privately-owned CDC facilities? So I guess that's the same question maybe that I just asked you. So California currently is not using any private facilities? That's right, and that's because it has been able to ensure that the facilities it is using are in compliance with the population cap. Let me ask you on a different topic here because Mr. Kirk was making some arguments, and I think probably one of his strongest cases is Boeing. And can you address how this, whether on this whole substantial interference, Mr. Kirk was arguing that this AB 32 substantially interferes with the federal government and decided to Boeing, and Boeing does involve federally-owned property, and I think some of that is his lease. Can you address Boeing? Yes, Your Honor. So there are numerous reasons, frankly, that the court in Boeing found direct regulation. One, that the legal incidence of the bill did actually apply to the federal government itself. It did not apply to Boeing. So that alone would mean that there is direct regulation of the federal government in Boeing. Two, as you noted, some of the property was federally-owned property, which we know from the Mayo cases, Hancock, and Goodyear. When it's federal property itself that's being regulated, then that constitutes direct regulation. That's not the case here. And third, and perhaps most crucially, the state statute in Boeing sought to supplant federal regulations that were incorporated in the terms of the contract. And the reason that matters is because the analysis of interference with contract terms was already undertaken by the plurality and the dissent in North Dakota. In North Dakota, the dissent proposed essentially the same thing as a substantial interference test, and it actually found that even though the regulations only had to do with beverage labeling, it would constitute a substantial interference. The plurality rejected that approach, and it said no. In Leslie Miller, in Public Utilities Commission, the interference with the contract terms constituted preemption because there were federal regulations that underlay those contract terms. Then there can only be preemption when there is a statute or a properly promulgated regulation to create that preemption. It cannot just be the fact that the federal government is engaging in an activity. There has to be a federal law because preemption is all about Congress's intent. It's not merely about a federal agency's intent. If I can interrupt you. Here, there is a federal regulation which authorizes ICE to contract with private detentions. Why doesn't California's law conflict with this? Regulations are considered federal laws. Why isn't there preemption? I'm sorry, can you point me to what regulation you're referring to? 48 CFR Section 3017.204-90. Sure. That regulation states that the ICE head of the contracting activity without delegation may enter into contracts of up to 15 years duration for detention or incarceration-based facilities, including related services. This essentially doesn't add anything other than the 15-year limit to what's already in Section 1103A11 specifically. We know that ICE can contract, but Congress specifically said, and there are clear manifest intent there, is for the contracts to be with states and local governments. This regulation does not state private detention facilities are included. It was promulgated against the backdrop of the existence of those statutes, so there's no clear manifest intent of any text saying that private detention facilities are to be used. What about, I think it was Mr. Stern who argued, or maybe Mr. Kirk, I apologize, that there are appropriations bills before and after AB 32 was enacted in which Congress allocates money for the operation of private detention facilities for ICE and also regulations. How do you respond to that? Sure, Your Honor. I think there's been no citation of any legal authorities stating that presumed congressional awareness of an agency's practice then creates congressional intent for that practice to continue. I think you can also infer from the fact that if Congress did know that that was happening prior to enacting Section 1103, then one would presume that when it listed specifically state and local governments as entities that could be subject to contract, that it would have included private detention facilities, especially with the fact that the U.S. Marshal Service statute was already on the books at that time and it did specifically list those statutes. So I think you can't... It's somewhat problematic that they would pay for it. I mean, if Congress repeatedly appropriated funds to pay for the operation of these facilities, how do we reconcile that with an argument that they did not intend for ICE to do this? Couldn't they just not appropriate the funds? Well, I think, first of all, again, there's been no citation to any... and obviously there's been an effort because there have been a lot of new authorities listed starting in the reply race, but none of them mentioned private detention facilities. And again, preemption has to be founded in the text of a legal authority. And, excuse me, so I don't think you can... If we can't identify any appropriations bill that is inconsistent with Section 1103 that only provides for state and local government contracts, then there isn't really a basis for preemption. And I think that point was very clearly made in the Kansas v. Garcia case just last year. Again, there has to be clear congressional intent that arises from the text of the statute. Can you respond to Mr. Kirkshartner regarding the Dawson case? Yes. And I believe it has to do with the intent of the legislature in drawing a distinction and creating an exception for one group. Dawson was about whether or not there could be different retirement benefits for state or federal employees, and the justification there was that federal employees tended to have better income than state employees. Dawson simply said you can't use the delineated categories as a proxy for the real difference that you're looking at. It also said, essentially, that there can't be simply a legislative moment of prop or policy preference in giving one group a benefit. But the real test is whether the groups are similarly situated. And so, again, if you compare the types of facilities issued with either grocery stores or schools, those are clearly very different categories. They're not similarly situated, and there has to be some kind of line drawing that's allowable there between different groups. And with respect to the court order, again, it's about not violating a constitutional limitation on what the state can do, and the fact that that makes the state differently situated in its facility than what it can do in its facilities as opposed to the federal government. I know I've addressed most of the points that I wanted to make. Let me ask you a question. I was going to ask Mr. Kirk, and I still may ask Mr. Kirk on the rebuttal, but assuming that there's no likelihood of success on the merits where that's determined, can you talk about the irreparable harm absent a preliminary injunction to GEO and whether or not they'd be irreparably harmed? Right. So irreparable harm means imminent harm, and I'd like to take this opportunity to make clear we have never conceded that the contracts at issue here are valid generally, or we don't consider they necessarily are valid through 2024. I think that's an important point because it goes to potentially further discovery and further proceedings in this case that could be necessary. But as to your point, the irreparable harm has to be imminent harm, and based on the allegations in plaintiff's complaints, based on evidence that's put forward, assuming the contracts are valid until 2024, the only harm that GEO has alleged or shown in its declarations has been monetary harm for succession of operations, which wouldn't happen until 2024, and a constitutional harm, which would not exist because presumably, based on what's been offered so far, AB 32 would not apply to it at all, so there can't be a constitutional violation. All right. I don't think there are any further questions. Ms. Bertanda, do you have any final statement? No, I think we covered the points. Okay. Thank you. All right. Next up, Mr. Wells, could you please state your appearance? Thank you, Your Honor. May it please the Court, Jordan Wells on behalf of the ACLU and the National Immigrant Justice Center. My friend, Mr. Stern, says that this is a policy choice for the federal government, but the framers of our Constitution vested all legislative powers in Congress alone. This appeal centers on a highly consequential federal policy, yet the plaintiffs cannot locate any plausible positive authority for the sprawling system of privately run ICE detention centers. I'm going to turn to the appropriations questions in a moment, but first I want to follow up on a couple of points that have come up so far. First, on a factual note, CDCR did pull out of at least two GEO facilities around the time of AB 32's enactment, and then GEO, which owned those facilities, struck up a new deal with ICE to repurpose them for immigration detention purposes, and that was in Kern County. Secondly, Judge Mergia is correct that it's not at all clear that the note to Section 4013 in Title 18, which is entitled Support of United States Prisoners, of course prisoners does not refer to people in ICE detention, it's not at all clear that that applies to DHS. GEO doesn't explain how it should. This is a provision buried in the 2001 Department of Justice Appropriations Act, and it's not at all clear how that applies to the DHS secretary. But even assuming DHS could properly invoke that provision, the regulation that Judge Lee cited, all that does is take advantage of the ability to contract for more than five years. That's reflected directly in the note itself in 4013, and all the regulation purports to do is to take advantage of that. It doesn't say anything about private detention, and we have cited in our amicus brief a contemporaneous legal opinion of the OLC, which I think explains the intent of 4013, and that intent is consistent with the regulation that DHS has adopted. I also want to say that they're not relying, the argument they're making about 4013 and their regulation is not actually based in the text of the regulation as DHS interpreted it, and the court doesn't owe deference to appellate counsel's interpretation of the way that the agency should interpret the note to 4013. Mr. Welch, your time is limited, so I just wanted to ask you a question. It seems like there's nothing in the immigration statute that expressly prevents contracts with private detention facilities. Has any other court concluded that the private detention or immigration detention is unlawful based on statutes you cited in your brief? Not that we're aware of, Your Honor, but the reason that this is coming up now is because of AB 32. It sort of brought to the surface this gap in federal statutory law because the government has come in and said, well, this conflicts with the federal activity, but the federal activity has to be based in some sort of positive statutory law. That is the way that the framers designed the Constitution, invested that authority in the legislature, and requires the bicameralism and presentment be satisfied. Neither of the plaintiffs have identified the point in time when Congress selected a policy to be able to contract out to private prisons, and neither have been able to deal with the fact that elsewhere throughout the U.S. Code, when Congress has wanted to enable an agency to delegate out arrest and detention functions, it has done so explicitly, including the Marshall Statute, including in the INA, but only as the state and local governments. If I may, since my time is short, I want to make sure I get to the appropriations questions that have come up. And I wanted to ask you, what should we make of the fact that private immigration detention has existed for quite a while and Congress has continued to appropriate funds for these facilities? Doesn't that show that Congress has implicitly at least authorized this practice? Your Honor, no, because the court's role in this is not to try to divine what is in the mind of Congress, and obviously that is, it's hard to even conceive of how, you know, to anthropomorphize Congress in that way. And the main argument, it seems like, is on reply that the appropriations legislation somehow implicitly ratifies an authority that didn't previously exist. But that claim, not the way that this case was presented, the P.I. was presented to the district court, but it also runs up against a presumption against implicit repeal that is especially strong in the context of appropriations provisions. And for that, I would note 140 Supreme Court 1308, Maine Community Health v. United States. Courts also construe appropriations... If I can ask a question, why is it not where the statute says that DHS secretaries can contract with anything, quote, as necessary to accomplish the agency's mission? Why isn't that enough statutory to contract with private detention facilities? Judge Lee, six answers to that. I'm not sure I'm going to get through them in 15 seconds, but first, the specific controls of general. So in 1103A11, you have Congress speaking very specifically to the question of who ICE may contract with. And in 8 U.S.C. 1357, you have Congress speaking very specifically to who has the arrest and detention functions under the INA. Those specific provisions trump the general statute. I see my time's up. I have more to say. But I assume you're assuming those are exclusive powers under that statutory provision as opposed to certain examples. Yes, because if the secretary's authority was read as broadly as the plaintiffs suggest, then it would not have made sense for Congress to go through the trouble of carefully delineating the arrest and detention functions in the INA, and it would render those provisions superfluous, which cuts against the core canon of construction. So I think I'm at two. The third reason is this 2002 statute should not be read to work a repeal by implication. As we know, as Justice Scalia colorfully put, Congress does not hide elephants in mouse holes. So in 2002, Congress didn't, in creating the DHS secretary, rework a substantive provision of the INA, more likely granted the secretary general contracting authority, except where it has otherwise specifically addressed it. But at that time, probably the attorney general had similar powers. Before DHS was created, it was within DOJ, so presumably the attorney general had similar powers to contract with private companies. Yes, but in 1996, Congress passed at the same time sections 1103A11 and recodified 1231G. It couldn't be clearer from section 1103A11 that Congress has spoken to when it is that ICE can contract out its detention functions, and has separately spoken to who has the power to do that. And it's federal immigration officers, and in limited circumstances, state officers. And so... But that's a difference between private parties and states under our constitutional system. I mean, we contract, federal government contracts with private parties all the time. We contract for IT services, security services abroad, to build buildings. We do that all the time. But states, obviously in a federal system, you have to be much more careful. So, I mean, it seems like 1103 is really about being careful, about anti-commandeering. We don't want the federal government ordering states to do certain things. And I guess my question is, I mean, federal government contracts with private parties to do so many things. I mean, does the federal government, does the statute literally list every single potential thing that the federal government can contract with? No, the rule we're arguing for is much narrower than that. When Congress has expressly and in detailed provisions addressed an area of contracting, then that displaces a more general grant of authority to the agency head to contract in that area. Again, that is in keeping with avoiding superfluous provisions. That's in keeping with the specific controls of the general. It's also in support of non-delegation principle where Congress would not leave major questions to an agency head when it has expressly addressed those elsewhere. So, let's see, what else? We have made the argument in the, well, let me just stop there because my time is up, but if there are more questions. Just last concluding statement, please. Sure. I guess what I would say is GEO's own brief recognizes that one could scarcely think of a more fundamental function of government than the physical detention of individuals for law enforcement. And both because of the plain text and ordinary meaning of the statute and because we believe this court should require a plain statement when Congress seeks to delegate out a core inherently governmental function to a private entity, we think the district court should be affirmed. All right. Thank you. Mr. Stern, I'll give you one minute for rebuttal. You're muted, Mr. Stern. Okay. I will try to speak super fast. The biggest point here is that on the state's theory about regulating on the basis of health and safety, it recognizes that if this were operated by the federal government itself, that it could not do this. Its argument is instead, well, but you're using contractors. And what every Supreme Court case and every case of this court has made clear is you cannot work what you could not do directly on the federal government by coming after the contractor. There is no doubt about that. There is not a case to the contrary, and there are lots and lots and lots of cases that say that that is the case. Plaintiffs rely in their brief, or defendants rather, rely on North Dakota and tax cases. This court in Boeing explained that those cases discussed generally applicable state tax laws, which resulted in nearly an increased economic burden on federal contractors as well. Judge Ludig in United States versus Virginia 30 years ago went through in detail to rebut precisely the same argument about North Dakota that plaintiffs make here. And those are the only authorities that they cite. And with respect to the appropriations, we're not looking for implicit ratification. These are explicit appropriations. We don't have to guess what was in Congress's mind. Congress wrote down exactly what it had in mind. And with respect to imminent irreparable harm, the district court did not question that it recognized explicitly that it was going to cause harm. And I would refer the court to the Johnson Declaration, paragraph 27, which explains not only the extent of the harm, but the fact that if the government had to start doing these things, there is a very long lead time. So the fact that you might have in theory until 2024 does not mean that the harm is not going to be occurring right now. Thank you, Mr. Stern. I appreciate it. Mr. Kirk, again, Mr. Stern. I ended up giving him two minutes, but I'll give you the same for two minutes. But part of that two minutes I meant to ask you before, I could ask you, assuming we agree with you regarding the likelihood of success on the merits, I'm trying to figure out why GEO would be irreparably harmed absent this preliminary injunction. Well, Your Honor, I respectfully disagree with my friend from California that the harm has to be imminent, particularly when you're dealing with something as complex and it requires such lead times as building new detention facilities. Three years is imminent. And obviously once AB 32 kicks in and applies to GEO, it won't be able to recover the revenue. California's got sovereign immunity. There's automatic irreparable harm as this court has held many times whenever a constitutional is violated. So our view is that it makes no sense to not resolve this now because if it turns out that California is right, the United States, and there's testimony in the record, that it takes them up to three years to add a facility. And I would direct you on that to ER 79. And if I could just quickly make one last response to Mr. Wells. His argument is primarily from negative implication that when Congress extended the power to contract with states, it impliedly did not include private persons. But if you look, and this is laid out on page 23 to 25 of the gray brief, that provision authorizing the contracts with states was added in the big immigration reform bill of 1996. At that time, INS was already using private facilities. So what he's asking you to conclude, and this is an elephant in a mouse hole if ever there was one, is that by authorizing the additional power to contract with states and local entities to provide detention services, Congress was implicitly repealing the power granted in the 1952 INA and still in the statute today that the secretary chooses appropriate places and the secretary may contract to carry out its functions. Last point, your honor. In that same statute, the immigration reform bill of 1996, Congress expressly instructed the attorney general to report to Congress the number of criminal aliens, quote, released from detention facilities of INS, open paren, whether operated directly by the service or through contract with other persons or agencies. So in the very statute that added the 1103A that Mr. Wells relies upon, Congress expressly recognized that INS was availing itself of private detention facilities. Again, that's section 386 and it's quoted on page 24 and 25 of our library. Thank you so much for your indulgence, Judge Merguia. Thank you very much. Thank you all for your oral argument presentations today on this very important, challenging case. So the case of the GEO Group and the United States of America versus Gavin Newsom and State of California is now submitted. But thank you all very much. We appreciate your presentations. At this time, we're going to take a 10-minute recess and then we'll resume with the final argument under seal. Thank you.
judges: Murguia, Bade, Lee